

**FILED**

NOV - 8 1999

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BORDEN RANCH PARTNERSHIP and )    CIV. S-97-0858 GEB JFM
ANGELO K. TSAKOPOULOS, )
               )
         Plaintiffs, )
               )
     v. )
               )
UNITED STATES ARMY CORPS, )    <u>FINDINGS OF FACT AND CONCLUSIONS</u>
OF ENGINEERS and UNITED )    <u>OF LAW</u>
STATES ENVIRONMENTAL )
PROTECTION AGENCY )
               )
         Defendants. )
_____ )
               )
And Related Counterclaim. )
               )
_____ )

      Plaintiffs Borden Ranch Partnership ("the Partnership") and

Angelo K. Tsakopoulos ("Tsakopoulos") commenced this action May 7,

1997, alleging statutory and constitutional claims and seeking

declaratory and injunctive relief.  The United States Environmental

Protection Agency ("the EPA") counterclaimed for alleged violations of

the Clean Water Act, 33 U.S.C. § 1311.  Summary adjudication in favor

of Defendants on Plaintiffs' claims was granted by an Order entered

June 9 and amended August 3, 1998 ("the August 3, 1998, Order").  The

*189*

1 counterclaim was tried to the bench from August 24 to September 16,
2 1999.  The Court's findings of fact and conclusions of law are as
3 follows.

I.

FINDINGS OF FACT

6 Findings of fact regarding background information are
7 contained in subsection A., *infra*.  Subsection B. describes specific
8 impacts upon relevant hydrological features.

A.

*Background*

11 On June 30, 1993, Tsakopoulos acting as general partner of
12 the Partnership purchased 8,348 acres of land situated ten miles east
13 of Galt, California for approximately $8.3 million.  Exhs. 4, 7, 8.[1]
14 This noncontiguous property ("Borden Ranch") straddles Dry Creek,
15 which forms the border between Sacramento County (to the North) and
16 San Joaquin County (to the South).  Approximately seventy percent of
17 the property is north of Dry Creek.  Exh. 67.  Borden Ranch previously
18 had been used primarily as rangeland for grazing cattle and producing
19 wheat, hay, alfalfa, tomatoes, sugar beets, beans, and corn.
20 Tsakopoulos intended to convert the majority of the land for use as
21 vineyards and orchards to increase the value of the property.

22 Besides Dry Creek, Borden Ranch encompasses Goose Creek --
23 which runs east to west through the San Joaquin County portion of
24 Borden Ranch -- and a significant number of hydrological features
25 known as swales, vernal pools, and intermittent drainages.  A swale is
26 a sloped wetland containing aquatic plant life which allows passage of

27

28

_____

The property is titled in Tsakopoulos himself.

2

small animal life, slows peak water flows, filters water, and
minimizes erosion and/or sedimentation. A vernal pool is a low point
in the landscape underlain with a dense soil layer and wherein
rainwater collects. Generally, it is inundated part of the year and
is dry during the summer, and may or may not be connected with other
hydrological features. Vernal pools also commonly serve as habitat
for exotic species of wildlife that have adapted to these features'
uncommon characteristics. Some of these species have been deemed
threatened or endangered under the Endangered Species Act. In the
United States, vernal pools are found chiefly within California and
are prevalent in the Central Valley. Intermittent drainages are
basically streams or water courses with a defined bed and bank that
generally transport water during and after rains. The intermittent
streams on the San Joaquin County portion of Borden Ranch are
tributaries of Goose Creek and Dry Creek, which are tributaries to the
Cosumnes and Mokelumne Rivers.

Most of Borden Ranch is underlain with a dense layer of
soil, called a "restrictive layer," or "clay pan," which prevents
surface water from reaching the depths required to be reached to
successfully utilize the property for vineyards and orchards, which
have deeper root systems than crops previously grown on the property.
Consequently, Tsakopoulos planned to plow much of the property using
plows that dig into the ground to a depth of five to seven feet. This
is called "deep ripping" and is accomplished by dragging long metal
"shanks" through the ground. Deep ripping alters the movement of
surface and subsurface water in the ripped areas by moving earth,
rock, sand, and biological matter both horizontally and vertically.
This allows water to percolate to greater depths and limits or

destroys the ability of jurisdictional waters to retain water.  Borden
Ranch also was plowed occasionally to a depth of 12 to 16 inches using
a method called "discing."  The purpose of these plowing activities
was, in part, to disturb the restrictive layer of the soil so that
deeper layers of soil could accept and retain moisture.

Tsakopoulos was aware of the presence of swales, drainages,
and vernal pools on the property at the time he purchased Borden
Ranch.  Exh. 2.  He also was aware that most or all of these features
constituted "waters of the United States" within the meaning and
coverage of the Clean Water Act ("the Act"); and, that any discharge
of fill material into a water of the United States was prohibited by
the Act unless a permit was obtained from the United States Army Corps
of Engineers ("the Corps").  Tsakopoulos has also been a real estate
developer since the early 1960s and had dealt with the Corps and
applied to the Corps for permits under the Act, on several occasions
since the mid-1980s in connection with activities associated with
various projects he was undertaking which implicated the Act and the
Corps's jurisdiction thereunder.  He had previously learned that there
exists an exemption from the Corps's permit requirement for certain
farming activities, including plowing, and he questioned whether this
exemption applied to his contemplated deep ripping activity.

Sometime in mid-1993, Tsakopoulos contacted Thomas Coe, an
officer at the Sacramento District of the Corps, and asked him whether
the land preparation activities he anticipated undertaking on Borden
Ranch would require a permit.  Coe told him that a permit could be
required if those activities would affect wetlands.  Shortly
thereafter, Tsakopoulos met with Coe and other Corps officials to
discuss whether the planned plowing would be exempt from coverage

4

under the Act as agricultural activity.  The Corps maintained that a
permit would be required.  In late October of 1993, Tsakopoulos
notified the Corps that he planned to cause plowing of a 444-acre
portion of Borden Ranch on the Sacramento side of Dry Creek, known as
the Castlehill parcel, and that this plowing would impact
approximately seven acres of wetlands.  Tsakopoulos hoped this
notification would enable him to obtain authorization under a
"nationwide permit," by which the Corps has allowed otherwise-
prohibited discharges of dredge or fill material into a certain
maximum area of jurisdictional waters conditioned upon, *inter alia*,
prior notice being given to the Corps.  See 33 C.F.R. Part 330, App. A
(B)(26) (1993).  When Corps representative Karen Shaffer visited the
property in October of 1993 to verify certain wetland delineation maps
provided by Tsakopoulos, she noted that Tsakopoulos's crews had
already commenced deep ripping the property and were driving their
plows over wetlands with the metal shanks raised at least partially
out of the ground.  She perceived that this activity disturbed the
soil to a depth of approximately six inches.  Exh. 9.  Consequently,
she told Tsakopoulos's representative then that undertaking such
activity on the property's wetlands without a permit would violate the
Clean Water Act.  Id.  An attorney for Tsakopoulos thereafter wrote to
the Corps, indicating that Tsakopoulos had a sale of that parcel
pending and requesting immediate advice regarding whether the planned
ripping and discing activities on the Castlehill parcel could proceed.
Exh. 10.  The Corps responded via a letter in early November 1993
wherein the Corps reiterated that Tsakopoulos's indicated activities
could cause "discharge of dredged or fill material in waters of the
United States" and that this would be allowed to occur into up to one

5

acre of wetlands on the parcel under the nationwide permit, but a permit would have to be obtained "under Section 404 of the Clean Water Act" if more than one acre was affected.  Exh. 11.

When the Corps concluded that the impacts of the proposed plowing on the Castlehill parcel would not be "minimal," it notified Tsakopoulos in late November of 1993 that he was not eligible for the nationwide permit.  Exh. 12.  The parties undertook further negotiations and, in March of 1994, the Corps agreed to allow the Castlehill plowing to take place in exchange for certain mitigation activities being undertaken by Tsakopoulos.  Specifically, Tsakopoulos was required to construct 4.77 acres of seasonal wetlands and to enhance and preserve certain other wetlands on the property.  An after-the-fact permit for the Castlehill project issued March 15, 1994.  Tsakopoulos eventually sold the Castlehill parcel in September of 1994 for approximately $1.66 million.  Exh. 67.

In May 1994, Tsakopoulos evinced a change of heart regarding Borden Ranch; he wrote to the Corps stating that he had abandoned his plan to convert the majority of Borden Ranch for use as vineyards due to the expense attended to the permitting process.  Exh. 547.  He said he would focus on continuing use of the property for ranching purposes.  By missive dated July 6, 1994, the Corps reiterated its position that deep ripping would not be exempt from Clean Water Act regulation.  Exh. 24.  In late September of 1994, Tsakopoulos and the Corps met with representatives of the EPA to discuss whether certain range management activities would be exempt from regulation under the Clean Water Act.  At this meeting, Tsakopoulos indicated that he still intended to deep rip the "uplands" -- areas that are not federal wetlands -- and the Corps indicated that this would not require a

6

permit.  Tsakopoulos further sought to drive deep ripping equipment over wetlands with the shanks raised to their uppermost position in order to avoid plowing those wetlands.  Tsakopoulos's consultant, Andrew Johas, represented that this would result in no continuous disturbance, but only in occasional "tagging" of the soil as bumps in the landscape met the raised shank.  The Corps agreed to allow this driving over the swales, but forbade driving over the vernal pools.[*]

In April of 1995, the Corps discovered that deep ripping of wetlands had occurred on another portion of Borden Ranch called the Prudential parcel.  A Cease-and-Desist letter issued April 12, 1995, that directed Tsakopoulos to stop deep ripping activities in waters of the United States.  Exh. 30.  At an April 18, 1995 meeting with representatives from the Corps, Tsakopoulos contended his understanding after the September 1994 meeting had been that all portions of Borden Ranch could be deep ripped except the vernal pools. Exh. 558.  After further discussions that month, Tsakopoulos submitted an application in May of 1995 for a permit covering a 1,268-acre area in Sacramento County.  Exh. 36.  In conjunction with this application, Tsakopoulos agreed to set aside 1,600 acres of Borden Ranch north of Dry Creek as a wetland preserve.  Id.  The application was handled on an "emergency" basis; a permit was sent to Tsakopoulos for his signature at the end of May 1995.  However, Tsakopoulos objected to

---

[*] Tsakopoulos testified at the bench trial that the agency officials had stated at this meeting that the vernal pools could legally be disced without a permit.  That testimony was not veracious and is belied by the consistent position federal officials expressed to Tsakopoulos on this matter.  As to the directives Tsakopoulos was given about deep ripping activity in jurisdictional wetlands, the no-ripping directive was clear and unwavering.  Although Tsakopoulos attempted to show that there was confusion about this amongst federal agencies, the directive he received from the Corps was categorical and pellucid.

certain details in the permit, drew a line to exclude the mitigation provision, and then signed and returned the permit to the Corps. Exhs. 38, 40.  The Corps responded by informing him in a June 30, 1995 letter that his alteration voided the permit and he was deemed to be proceeding without one.  Exh. 40.  In mid-July, Tsakopoulos submitted another permit application to construct and operate a separate 816 acres of vineyards on the Sacramento County side.  Exh. 572.

Deep ripping activities continued on the Sacramento County side without a permit and commenced on the San Joaquin County side of Borden Ranch in October of 1995.  In November of 1995, the Corps learned that deep ripping on wetlands had again occurred, this time in two areas on the Sacramento County side, one of which had been part of the wetlands preserve that Tsakopoulos had indicated would be set aside as mitigation in his May 1995 permit application.  Exhs. 580, 582.  A second Cease-and-Desist letter issued November 22, 1995.  Exh. 50.

Deep ripping on the San Joaquin County side proceeded initially in parcels numbered 6 and 10.  Exh. 47.  It is unclear to what extent flagging of jurisdictional waters had taken place there. At a late November 1995 meeting attended by representatives of Tsakopoulos and Sugnet and Associates ("Sugnet"), the company hired by Tsakopoulos to assist in the permitting process, the flagging and marking of property on the San Joaquin County side of Borden Ranch was discussed.  Deep ripping also occurred in parcels 8 and 9 on the San Joaquin County side, where only vernal pools had been flagged to alert deep ripper equipment operators to avoid them.  The senior project manager from Sugnet told Tsakopoulos that flagging was done *only* around vernal pools pursuant to a direction from Chris Vrame, one of

Tsakopoulos's consultants.  Vrame, who also was present, told
Tsakopoulos that he had received such direction in a memorandum from
Tsakopoulos's company, AKT Development Corporation.  Tsakopoulos
became very upset, and Vrame directed that flagging be placed around
all swales and drainages on the San Joaquin side and that aerial
photographs be taken of the damaged areas.

On December 4, 1995, Coe and Tsakopoulos visited a portion
of the Sacramento County side of Borden Ranch, delineated as parcel
15, and observed that some of the swales located thereon had been deep
ripped and then disced, resulting in their complete obliteration, and
that only some of the vernal pools had been flagged by the plowing
crews.  Those not flagged had been filled in with soil.  Tsakopoulos
indicated that he had told the plow operators to completely avoid the
vernal pools.  In late December of 1995, Tsakopoulos executed a
contract to sell parcel 10 on the San Joaquin County side,
encompassing 197 acres, to a California partnership called Watts
Vineyard for $574,000.  Exh. 60.  By the end of 1995, Tsakopoulos had
sold two other parcels totaling approximately 1,266 acres for slightly
more than $5.45 million, in addition to the Castlehill and Watts
Vineyard sales.  Exh. 67.

In early January of 1996, Sugnet prepared a summary of the
amount of acres of "basins" and swales that had been deep ripped.  The
"basins" therein referred to vernal pools.  According to Sugnet's
summary, 0.52 acres of swales had been deep ripped on the San Joaquin
County side of the property in parcels 6 and 10.  Exh. 61.  This
summary was transmitted to Vrame.

In February of 1996, the EPA entered into discussions with
Tsakopoulos aimed at the execution of an Administrative Order on

9

Consent ("AOC") which would address all Clean Water Act violations on the Sacramento County side of Borden Ranch.  In March of 1996 Tsakopoulos submitted a map delineating wetlands features on the San Joaquin County side.  Exh. 63.  An officer from the Corps, Thomas Cavanaugh, visited Borden Ranch twice in early April 1996 to verify this delineation map.  During his visits, he noted that several swales on parcels 6 and 10 had been deep ripped; furrows caused by plowing in those areas were two-to-three feet deep and crossed over the wetlands.  However, vernal pools on parcel 10 apparently had been avoided by the plows.  After field verification was completed, the wetlands delineation map was revised.  The Sugnet wetlands delineation map identified a total of 66.29 acres of "jurisdictional waters" of the United States on the San Joaquin County side of Borden Ranch.  Exh. 65.

Tsakopoulos entered into a contract in March of 1996 to sell a 400-acre portion on the Sacramento County side to a California corporation, Farmland Management Services, for $1.4 million.  Exh. 588.  By April 30, 1996 he had sold or had sales pending for 4,036 acres of Borden Ranch.  Exh. 67.  The total sales price for this property equaled approximately $16.2 million.  Id.

On May 3, 1996, a final AOC was executed which resolved the alleged Clean Water Act violations[3] on a 2,100-acre portion of Borden Ranch north of Dry Creek, whereon the EPA had alleged that 49.1 acres of waters of the United States had been disturbed.  Exh. 66.  It was agreed that a 1,368-acre preservation would be set aside as mitigation for these violations and that Tsakopoulos would pay $44,700 to

---

[3]   Tsakopoulos did not admit therein that any violation had occurred.  Exh. 66 at 9.

1  maintain the preserve.  _Id._  The AOC also memorialized Tsakopoulos's
2  contention that this preserved land "contain[ed] environmental and
3  wildlife functions in excess of that which is needed to compensate for
4  the alleged impacts to functions of waters of the United States
5  resulting from" Tsakopoulos's plowing activities.  Exh. 66.  It was
6  agreed that the EPA and/or Tsakopoulos would undertake further studies
7  regarding the possibility that he had undertaken excess mitigation and
8  would, if any dispute thereafter remained, submit the dispute for
9  resolution by the EPA's Regional Administrator and the Corps's
10 District Engineer.  _Id._ at 13-14.  Finally, Tsakopoulos agreed to
11 cease further discharges into waters of the United States "except in
12 compliance with an appropriate authorization under the" Clean Water
13 Act.  _Id._ at 11.  A permit for the 2,100-acre portion on the
14 Sacramento County side which was covered by the AOC issued May 8,
15 1996.  Exh. 593.

16        In late June of 1996, Tsakopoulos's consultants learned that
17 agents of McCarty Co., which had purchased an 800-acre portion of
18 Borden Ranch in 1995, had illegally plowed and filled in almost half
19 of the wetlands on that portion.  Exh. 600.  Tsakopoulos directed the
20 consultants to monitor McCarty Co.'s activities on the parcel.  _Id._

21        By letter dated July 8, 1996, the Corps informed
22 Tsakopoulos's project manager that the wetlands delineation map
23 submitted in March and revised in April had been "reviewed and
24 verified."  Exh. 70.  That letter also stated, in part:

25              Our jurisdiction in this area is under Section
26        404 of the Clean Water Act.  A Department of the
              Army permit is required prior to discharging
27        dredged or fill materials into waters of the United
              States.  Discharge of dredged material includes but
28        is not limited to any addition, including
              redeposit, of dredged material, including excavated
              material, into the waters of the United States

which is incidental to any activity including mechanized land clearing, ditching, channelization, or other excavation. Accordingly, a permit will be required **PRIOR TO ENGAGING IN ANY EARTHMOVING ACTIVITY** in any of the 66.29 acres of waters, including the swales, present on [the San Joaquin County side of] Borden Ranch . . . .

In addition, two areas on the San Joaquin County portion were deep ripped without Department of the Army authorization. These violations were not resolved with the Administrative Order pertaining to other portions of the ranch. Therefore, a permit application, along with a mitigation plan, should be submitted as soon as possible if your client wishes to retain these fills.

Id. (emphasis in original).

On September 5, 1996, Tsakopoulos and several representatives from the Corps, the EPA, and the offices of certain United States legislators visited Borden Ranch to inspect vernal pool sites. The Corps's representatives reiterated that wetlands on the property could not legally be deep-ripped without a permit and that vernal pools had to be avoided. Exh. 615. Tsakopoulos understood and agreed. In late September of 1996, Tsakopoulos met with Champ to discuss ongoing plowing activities on the San Joaquin County portion of Borden Ranch. Exh. 77. Tsakopoulos indicated that he would file a permit application by mid-October 1996. Id. Shortly thereafter, Champ wrote to Tsakopoulos and reiterated his belief that Tsakopoulos then "underst[oo]d that the discharge of fill material, including redeposit of excavated material for the purposes of installing vineyards in rangeland, requires a Section 404 permit." Champ further wrote that "any earthmoving activities that involve waters of the United States, including swales," required a permit. Id.

In November of 1996, Cavanaugh again visited the San Joaquin County portion of the property after having been told by one of

12

Tsakopoulos's employees that deep ripping had resumed there.  He saw that parcels 6, 8, and 9 had been deep ripped and observed evidence of tracks evidently left by deep ripping equipment evincing that some of the swales on those parcels had been deep ripped.  He also noted that parcel 10 -- which earlier had been sold to Watts Vineyard -- had been disced and planted with vineyards.

By the end of 1996 Tsakopoulos had not yet filed a permit application for the remaining activities on Borden Ranch.  In a December 23, 1996 letter, he wrote to Champ explaining that "the delay to date in submitting the application" had been caused by the "time-consuming and costly" process of "gathering the voluminous information required for the application."  Exh. 92 at 1.  Tsakopoulos further mentioned instances involving his contention that the Corps had previously said he could "shallow plow through drainage swales."  Tsakopoulos concluded the letter by complaining about the involved federal agencies' continued "effort to prevent ongoing agricultural activities from proceeding on Borden Ranch and stated that "the financial cost to the Partnership of this prolonged situation has been colossal."  Id. at 3-4.  Champ responded with a letter dated January 17, 1997, wherein he stated, *inter alia*, that "the conversion activities you have engaged in [on Borden Ranch] and wish to continue with are not covered by any existing exemptions and require Department of the Army authorization."  Exh. 95.  Champ concluded by indicating that expedited processing for any permit application would not be available to Tsakopoulos.  "Therefore, if you wish to proceed with additional vineyard installation on Borden Ranch this Spring, you need to submit your permit application very soon."  Id.

In late January 1997, Tsakopoulos submitted a permit

1  application for the remainder of the Borden Ranch project: the

2  conversion of approximately 832 acres in Sacramento County and 2,418

3  acres in San Joaquin County.  Exh. 96.  It was estimated therein that

4  77.19 acres of waters of the United States existed in the San Joaquin

5  portion; that only 21.79 acres of these jurisdictional waters would be

6  affected by discing operations;[4] all vernal pools were to be avoided

7  on the San Joaquin County side; "deep plowing will occur in upland

8  areas"; "[w]hen passing through [waters other than vernal pools], the

9  shank will be raised to its maximum height"; and, Tsakopoulos proposed

10 setting aside a preserve totaling approximately 523 acres in

11 mitigation of the proposed plowing effects; of which 51 acres would be

12 wetlands.  Id.  In response to the question on the form application,

13 "Is Any Portion of the Work Already Complete?", Tsakopoulos answered

14 affirmatively and explained as follows:

15          Upland areas of Parcel 1 in Sacramento County and
           Parcels 6, 8, and 9 in San Joaquin County have been
16          deep ripped.  Vernal pools and major drainages were
           avoided.  The shank was raised as high as possible
17          when passing through major drainages.

18 Id.

19 However, there was no mention in this application that deep ripping

20 had occurred within parcel 10 on the San Joaquin County side of Borden

21 Ranch.  Further, the record reveals that on many occasions, the shank

22 had not been raised as high as possible as it passed through

23 drainages.

24          In a letter dated March 21, 1997, the United States Fish and

25 Wildlife Service ("the Service") wrote to the Corps against the

26 _____

27      [4]    A revision provided to the Corps in early February altered
        these numbers slightly.  Of 77.16 acres estimated to constitute
28 wetlands on the San Joaquin County portion, 20.66 acres were predicted
        to be directly impacted by plowing activities.  Exh. 97.

January 1997 permit application, stating:

>                It has come to the Service's attention that
>                [Tsakopoulos] has recently engaged in unauthorized
>                deep ripping on approximately 400 acres of land in
>                the southern-most San Joaquin portions of the
>                Borden Ranch property.  In addition, the Service
>                has been informed that a second potential [Section]
>                404 violation has occurred on a 200 acre parcel
>                that lies north-west of the San Joaquin project
>                area within the Borden Ranch boundary.  This 200
>                acre section of land was deep ripped and
>                subsequently sold.   An undetermined amount of
>                wetland impacts have occurred from these actions.

Exh. 100.

The Service also described the impacts upon wildlife that the proposed

plowing would have, as well as the indirect and negative effect that

conversion to vineyards could have on vernal pools.  Id.

        Coe sent Tsakopoulos a letter dated March 25, 1997, in which

Coe explained that the Corps had received objections to his

application from the Service, the EPA, the State of California, and

other concerned organizations and citizens.  Exh. 101.  Copies of

those letters of objection were provided with Coe's letter.  Coe also

indicated that the Corps's decision on the application would be

delayed until April 23, 1997, in order to allow Tsakopoulos the

opportunity to rebut these objections or propose mitigation measures

appropriate to resolve them.  Id.  Coe added:

>                In addition it is apparent that, once again,
>                land preparation activities have been ongoing
>                without Department of the Army authorization.  One
>                parcel in San Joaquin County, Parcel 10, has
>                apparently been sold and has already been planted
>                in vineyards.  The wetland swales and drainages on
>                this parcel have been filled and the vernal pools
>                within the vineyard have been severely degraded by
>                the surrounding vineyard activities.  In addition a
>                large portion of Borden Ranch has been ripped and
>                disced without Department of Army authorization.
>                It is obvious that the ripper shank passed through
>                many of the swales and drainages.  Soil was moved
>                into a number of these drainages by turning

15

> equipment and at least one vernal pool within this
> area was directly affected by the ripping and
> discing operation.    It also appears that the
> ripping equipment is positioned and ready to resume
> ripping operations.
>
>         . . .  No further soil manipulation should
> occur in those areas of Borden Ranch for which a
> permit has not been issued  until a final permit
> decision has been made for the remainder of the
> property.

Id.

On April 10, 1997, EPA investigators visited Borden Ranch
and observed fully-engaged deep rippers passing over jurisdictional
wetlands in parcel 8.  On April 14, 1997, the EPA issued an
Administrative Order, signed by the Acting Director of the EPA's Water
Division, Alexis Strauss, finding that Tsakopoulos had violated the
Clean Water Act during plowing activities commencing in October, 1996.
Exh. 103.  That Order directed Tsakopoulos to provide to the EPA,
within five days, written certification "under penalty of law" that
activities affecting jurisdictional waters had ceased and to specify
the date and time of cessation.  Id.  Tsakopoulos sent a reply letter
to Strauss dated April 21, 1997, in which Tsakopoulos questioned the
regulatory authority "of both the EPA and the Corps" over his plowing
activities on Borden Ranch and said no "unauthorized activities" had
been conducted "in any 'waters of the United States,' except for one
minor involvement of shallow plowing in a swale -- the mistaken action
of a party which purchased a parcel at Borden Ranch."  Exh. 639 at 2.
He declined to certify that the alleged unpermitted discharges had
ceased, opining that the EPA had no power to require the
certification.  Id.

Shortly after Tsakopoulos received the Administrative Order
from the EPA, his chief consulting firm for the Borden Ranch project,

16

Foothill Associates ("Foothill"),[5] visited parcels 6, 8, and 9 in order to place metal T-posts around the swales and intermittent drainages on these parcels.  Sugnet had previously caused the vernal pools thereon to be so marked.[6]  Foothill placed stakes 10 to 15 feet outside of what was perceived to be the limits of jurisdiction to create a buffer zone.

Between April 17 and April 25, 1997, the EPA's wetlands consultant, Dr. Lyndon C. Lee, visited Borden Ranch with some of his employees to document violations of the Clean Water Act on parcels 6, 8, 9, and 10 on the San Joaquin County side.  Exh. 156.  He was accompanied by an EPA representative each day; most often, that representative was Robert Leidy.  While at the property, Leidy observed a deep ripping machine with its shank in the uppermost position.  In this position, the cutting edge of the shank was completely out of the ground.  Leidy also saw furrows that were two to three feet deep crossing through two swales and a vernal pool on parcel 9 and noted that five vernal pools on parcels 6 and 8 had been completely filled in.  On April 25, 1997, Dr. Lee met with Tsakopoulos and discussed Dr. Lee's observations of deep ripping across jurisdictional wetlands.  Tsakopoulos initially expressed that there had been no deep ripping on wetlands.  Together they visited several jurisdictional features, including a vernal pool in parcel 9 around which five-foot-high metal stakes had been placed.  The stakes had

---

[5]     Foothill had replaced Sugnet as the chief consultant on this project sometime between late 1995 and early 1996.

[6]     Initially, the markings were problematic because they were not conspicuous enough to be observed by deep ripper operators.  They improved over time, but they probably could not be easily seen at night when much of the deep ripping activity occurred.

been knocked over and marks on the ground indicated that a deep ripper
had crossed through the feature several times without its shank
raised.   Tsakopoulos then conceded that mistakes had been made.

        After making his observations on Borden Ranch, Dr. Lee
caused to be created a 96-page, 11" x 17" document entitled
"Documentation of Impacts" which described the effect that plowing
within the studied parcels had on 40 linear features -- *i.e.*, swales
and intermittent drainages -- and on six vernal pools.  This document
was subsequently revised; the current version is dated April 28, 1999.
Exh. 148.

                                B.

                *Impacts upon Waters of the United States*

        Dr. Lee's "Documentation of Impacts" is the most thorough
documentation that has been made regarding Clean Water Act violations
in the relevant portions of Borden Ranch.  Based upon his report and
other evidence presented during the bench trial, this Court finds
that, under the preponderance of the evidence standard, deep ripping
on Borden Ranch caused fill material to be discharged into 35
hydrological features situated in parcels 6, 8, 9, and 10 on the San
Joaquin County side of the property.  Of these 35 features, 28 are or
were swales or intermittent drainages that are hydrologically related
to navigable, interstate waters.  One feature is a depression that is
adjacent to a swale that is hydrologically related to navigable,
interstate waters.  The remaining six features are or were isolated
vernal pools.  The "drainage" numbers and "depression" numbers that
are referred to herein are taken from Dr. Lee's report and testimony.
Exh. 148.  A "drainage" number refers to either a swale or an

intermittent drainage; a "depression" number denotes an isolated vernal pool.

Parcel 10, shaped roughly like a right triangle, is the northwesternmost parcel on the San Joaquin County side of the property.  It shares no boundary with the other parcels on the south side of Dry Creek.  Drainage 9 is an approximately 800-foot-long intermittent drainage flowing north to south in the southeast corner of this parcel.  It has been completely filled by deep ripping, discing, and the planting of vineyards.  The deep ripper shank passed through this drainage several dozen times with its shank down. Drainage 10 is a 1,300-foot-long north/south intermittent drainage flowing to the southern boundary of parcel 10.  This wetland also has been nearly completely obliterated due to several passes by a deep ripper with its shank down, subsequent discing and planting with vineyards.  Drainage 34 is a swale that runs north to south for approximately 200 feet and reaches the southern border of parcel 10 roughly 850 feet west of drainage 10.  This also has been completely filled after several passes with a fully-engaged deep ripper and subsequent discing and planting with grapes.  Drainage 35 is another swale, situated near the southwestern corner of parcel 10, which has been deep ripped, disced and planted with vineyards.  It was approximately 700 feet long and has been completely filled.  Nearby on parcel 10 is drainage 36, which has been completely filled by deep ripping, discing and planting.  It had been a swale of approximately 350 feet in length.  Along the northwestern boundary of parcel 10 lay a 150-foot long swale, drainage 37, which slopes down toward the northwest and Dry Creek.  It also has been completely filled by deep ripping, discing, and planting of vineyards.  Approximately 940 feet

19

to the east of that is drainage 38, a 200-foot-long swale also sloping
to the northwest and which has been similarly filled.  The final
affected feature on parcel 10 is drainage 40, a forked swale totaling
1,450 feet in length and situated in the northeast corner of this
parcel.  The entire feature is filled after deep ripping; the north-
south portion of the swale is planted with vineyards and the east-west
stretch is currently used as a dirt road connecting two other roads
that run along the eastern and northwestern boundaries of the parcel.

Parcel 8 is a 150-acre portion of Borden Ranch adjacent to
and north of Goose Creek.  Drainage 5 is an intermittent drainage that
flows north to south for 800 feet along the western boundary of the
parcel.  It has been deep ripped and partially filled in.  Drainage 7
is centrally located on the parcel and flows south into Goose Creek.
It is an 846-foot-long intermittent drainage and has been partially
filled by deep ripping.  Drainage 8 is a 1,357-foot-long intermittent
drainage which flows south meeting Goose Creek approximately 1,000
feet upstream from drainage 7.  It has been deep ripped and partially
filled.  Depression 2 is a vernal pool located in the northwestern
corner of parcel 8, approximately 375 feet west of Mackville Road.
The pool had covered an area of roughly 150 square feet, but has been
deep ripped, disced, cultivated, and completely filled.  Two other,
larger vernal pools that lay within approximately 150 feet of this
pool were not plowed.  Each of them was studied in May of 1997 and
March of 1998 and was found to be inhabited by *branchinecta lynchi*, or
vernal pool fairy shrimp, a threatened species under the Endangered
Species Act.  Exh. 138.  When the closer of the nearby pools floods,
water therein occasionally spills into depression 2, which is located
slightly downgrade.  Considering the proximity of these pools and this

hydrological relationship with one of them, depression 2 more likely than not served as a habitat for vernal pool fairy shrimp before it was plowed.  The last feature on parcel 8 is a 460-foot-long swale -- drainage 20 -- located in the northeast corner of the parcel.  This feature has been deep ripped and disced and, resultantly, partially filled.

Parcel 9 is another 150-acre parcel east of parcel 8 and Mackville Road and north of Goose Creek.  Drainage 19 flows for approximately 1,620 feet southward near the western boundary of the parcel and into the Creek.  This feature starts as a swale and, after 900 feet, acquires the characteristics of an intermittent drainage. The upper swale portions have been partially filled due to deep rippers plowing to the edge of the feature and depositing soil into the swale.  The lower intermittent drainage has been similarly affected by adjacent deep ripping.  Drainage 23, a 430-foot-long swale, is another feature adjacent to which there has been deep ripping that has lead to a discharge of fill material into the wetland.  Situated in the northeastern corner of parcel 9, drainage 29 is a "Y"-shaped swale totaling 1,077 feet in length into which, due to proximate deep ripping, a small amount of fill material has been deposited.  To the west of drainage 29 are drainages 30 and 31.  These north-to-south swales have been deep ripped through near where they meet Goose Creek, resulting in significant discharges of fill into each body of water.  Upon Dr. Lee's visit to these swales, he observed continuous furrows measuring approximately two feet from the base of the trench to the top of the mounds on each side and stretching perpendicularly across each feature at intervals of approximately 15

21

feet.[7]  A vernal pool designated depression 1 lay north of drainages
30 and 31.  This is the pool whereat Tsakopoulos himself witnessed
that plows had knocked over the metal stakes which had surrounded the
feature.  Approximately 215 square feet in area, this pool has been
completely obliterated by deep ripping and discing; however, the pool
was deep ripped through in only one direction, rather than two
directions like the adjacent uplands.  Sampling of the pool in May of
1997 demonstrated the presence of certain vernal pool obligate plant
species, including Eryngium and Psilocarphus.  These species can only
survive in wetlands that are inundated for a substantial portion of
the year.  However, there has been no showing that vernal pool fairy
shrimp inhabited this or any nearby pool.  Nor has it been shown that
this pool supported any other threatened or endangered species prior
to its having been deep ripped.  There is credible evidence in the
record that certain migratory birds were spotted on other, rather
distant portions of Borden Ranch[8] and evidence reveals that relatively
small vernal pools like depression 1 can be used by migratory birds
for feeding, resting, cover, and breeding.  However, it has not been
demonstrated that depression 1 was a potential habitat for migratory
birds.  The final relevant feature in parcel 9 is drainage 32, an
intermittent drainage 300 feet in length that has been deep ripped,

---

[7]     Tsakopoulos has attempted to attribute these phenomena to
deep rippers passing over the swales with the shank raised to the
uppermost position.  However, the evidence reveals that the furrows
were not caused by shanks tagging the surface.

[8]     Over the course of at least seven-days' observations over
the course of the year May of 1997 through April of 1998, migratory
birds apparently were sighted only once within 1,000 feet of this
pool; on June 19, 1997, horned lark were spotted somewhere along
drainage 30, which is situated 300 feet from depression 1 at its
closest point and 900 feet at its farthest.  Exh. 146.

1  disced, and planted.  Resultantly, this feature is nearly completely
2  obliterated.

3       The final parcel at issue, number 6, is located on Borden
4  Ranch south of Goose Creek.  Depressions 3 through 6 -- vernal pools
5  situated in the southwesternmost portion of the parcel -- have been
6  completely obliterated by deep ripping and discing.  These four pools
7  were each approximately 150 square feet in size.  Approximately 175
8  feet north-northeast of depression 3 there exists a vernal pool -- one
9  much larger in size than the plowed pools -- in which vernal pool
10 fairy shrimp were found during sampling in May of 1997.  Exh. 138.
11 However, thorough sampling of depressions 3 through 6 revealed no
12 threatened or endangered species.[9]  There is also insufficient
13 evidence in the record to establish either that vernal pool obligate
14 plant species inhabited these pools, that these pools were
15 hydrologically related to a pool inhabited by a threatened or
16 endangered species, or that such a species had been or would be
17 brought to one or more of these pools via some other mechanism, such
18 as through its attachment to wildlife that had or would frequent other
19 pools.  Additionally, it has not been demonstrated that any of these
20 pools could potentially serve as habitat for migratory birds.

21      Turning to the linear hydrological features of parcel 6,
22 drainage 1 is a multi-branched hydrologically-interrelated system
23 broken down by Dr. Lee into six features: four swales, an intermittent
24 drainage, and a depression.  Only three of them are alleged to
25 constitute violations.  Drainage 1C is in fact an ellipse-shaped
26
27

[9]       In testing each of depressions 3 through 6, twice as much
28 material was sampled as was taken from other vernal pools on Borden
Ranch.

1 | depression measuring approximately 38 feet on its longer axis.  This
2 | depression is adjacent to drainage 1B, which is a swale that flows
3 | into drainage 1A and ultimately into Goose Creek.  Twelve linear feet
4 | at one end of drainage 1C have been deep ripped and disced;
5 | resultantly, that end of the depression has been completely filled.
6 | Drainage 1D is a 458-foot-long swale and drainage 1E is a 150-foot-
7 | long swale.  Each has been deep ripped, disced, and partially filled.
8 | Situated at the western boundary of parcel 6, drainages 3 and 4, are
9 | swales that have been partially filled by deep ripping and discing.  A
10 | 2,080-foot-long intermittent drainage which flows northward toward
11 | Goose Creek -- drainage 13 -- also has been partially filled by deep
12 | ripping and discing.  Nearby, drainages 14, 15, and 18 are smaller
13 | features which have been deep-ripped across at certain points.  Fill
14 | has been deposited therein as a result.  Finally, drainages 25 and 26
15 | are situated on the eastern "panhandle" portion of parcel 6; these
16 | features have been subjected to substantial discharges of fill --
17 | drainage 25 has been totally filled -- as a result of deep ripping and
18 | discing across these wetlands.  A 103-foot-long portion of drainage 26
19 | has been completely filled and soil is mounded along where the water
20 | in this part of the feature had flowed.

21 |                               II.

22 |                       CONCLUSIONS OF LAW

23 |          Conclusions of law and further findings of fact necessary to
24 | reach certain legal conclusions follow.

25 |                                A.

26 |                          *Burden of Proof*

27 |          The EPA bears the burden of proving by a preponderance of
28 | the evidence that Tsakopoulos has violated the Clean Water Act;  this

24

1  "simply requires the trier of fact to believe that the existence of a

2  fact is more probable than its nonexistence before [he] may find in

3  favor of the party who has the burden to persuade the [judge] of the

4  fact's existence." Concrete Pipe & Products, Inc. v. Constr. Laborers

5  Pension Trust, 508 U.S. 602, 622 (1993) (quoting In re Winship, 397

6  U.S. 358, 371-372 (1970) (Harlan, J., concurring)) (internal

7  quotations omitted). Tsakopoulos has raised the defense of estoppel

8  to a portion of the EPA's counterclaims. The burden of proving this

9  defense rests upon Tsakopoulos. See United States v. Omdahl, 104 F.3d

10  1143, 1146 (9th Cir. 1997).

11                                    B.

12                            *The Clean Water Act*

13        The Clean Water Act prohibits "the discharge of any

14  pollutant by any person" from any "point source" into waters of the

15  United States absent compliance with, *inter alia*, section 1344.  33

16  U.S.C. §§ 1311(a), 1362(7, 12).[10]  A "pollutant" is defined to include

17  "dredged spoil, . . ., rock, [or] sand . . . discharged into water."

18  Id. § 1362(6).  A "point source" is a "discernible, confined and

19  discrete conveyance," and, under the circumstances of this case,

20  includes a plow. Id. § 1362(14); see also August 3, 1998, Order at

21  11-12 (citing cases).

22        The EPA is empowered to "prescribe such regulations as are

23  necessary to carry out [its] functions" under the Clean Water Act.  33

24  U.S.C. § 1361(a).  Pursuant to this authority, the agency has defined

25  "waters of the United States" to include interstate waters and

26  wetlands, intrastate waters and wetlands "the use, degradation, or

27  _____

28        [10]    Unless otherwise noted, all references herein to sections
       are to sections of Title 33 of the United States Code.

                                    25

destruction of which could affect interstate or foreign commerce," and wetlands adjacent to such waters.  40 C.F.R. § 232.2.  "Wetlands" are "areas inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions" and generally include "swamps, marshes, bogs, and similar areas."  Id.  In the preamble to its regulations, the EPA clarified that interstate commerce would typically be affected by the destruction of waters "[w]hich are or would be used as habitat by birds protected by Migratory Bird Treaties[, w]hich are or would be used as habitat by other migratory birds which cross State lines[,]  or [w]hich are or would be used as habitat for endangered species."  53 Fed. Reg. 20,764, 20,765 (1988); see also 51 Fed. Reg. 41,206, 41,217 (1986) (preamble to the Corps's regulations).[11]

---

[11]    The EPA further stated in its preamble that,

if evidence reasonably indicates that isolated waters are or would be used by migratory birds or endangered species, they are covered by EPA's regulation.  Of course, the clearest evidence would be evidence showing actual use in at least a portion of the waterbody.  In addition, if a particular waterbody shares the characteristics of other waterbodies whose use by and value to migratory birds as [sic] well established, and those characteristics make it likely that the waterbody in question would also be used by migratory birds, it would also seem to fall clearly within the definition (unless, of course, there is other information that indicates the particular waterbody would not in fact be so used).  Endangered species are, almost by definition, rare.  Therefore, in the case of endangered species, if there is no evidence of actual use of the waterbody (or similar waters in the area) by the species in question, one could actually assume that the waterbody was not susceptible to use by such species, notwithstanding the particular characteristics of the waterbody.  However, in each case a specific determination of

(continued...)

Section 1344 allows the Corps to issue permits allowing the discharge of "dredged or fill material" into waters of the United States.  33 U.S.C. § 1344(a, d).  Certain practices are exempt from section 1311(a)'s prohibition of discharges of dredged or fill material and the attendant permit requirement; these activities include "normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices."  Id. § 1344(f)(1).  However, pursuant to regulations promulgated by the EPA, this exemption is limited to "established (i.e., ongoing) farming, silviculture, or ranching operation" and not to "[a]ctivities which bring an area into farming, silviculture or ranching use" or which target an area which "has lain idle so long that modifications to the hydrological regime are necessary to resume operation."  40 C.F.R. § 232.3(c)(1)(ii)(A, B).  Tsakopoulos's activities on Borden Ranch thus do not qualify for this exemption.  See August 3, 1998, Order at 14-18.

Section 1319(b) authorizes the EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, for violations of the Clean Water Act.  A civil penalty for such violations is established by section 1319(d), which provides, in pertinent part:

> Any person who violates section 1311 . . . of this title . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation.  In

[1] (...continued)
jurisdiction would have to be made, and would turn on the particular facts.

53 Fed. Reg. 20,765.

> determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

The civil penalty for violations occurring after January 30, 1997, has been raised to $27,500. 40 C.F.R. §§ 19.2 & 19.4; Debt Collection Improvement Act of 1996, Pub. L. 104-134, Title III, § 31001(s), 110 Stat. 1321-373 (April 26, 1996) (codified at 28 U.S.C. § 2461 note). This Court also has jurisdiction to issue injunctive relief to "restrain [any] violation and to require compliance" with the Act. 33 U.S.C. § 1319(b). Therefore, an injunction may be issued which requires restoration, replacement, or mitigation for any damaged jurisdictional waters as may be required by equity. United States v. Telluride Co., 146 F.3d 1241, 1247 (10th Cir. 1998); United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982)).

The EPA seeks the imposition of a civil penalty upon Tsakopoulos and an injunction requiring restoration of the features which have been damaged and/or the creation of similar features elsewhere.

C.

*Violations of the Clean Water Act*

1.

Jurisdictional Features Affected

The swales and intermittent drainages enumerated by Dr. Lee as drainages 1C, 1D, 1E, 3, 4, 5, 7, 8, 9, 10, 13, 14, 15, 18, 19, 20,

23, 25, 26, 29, 30, 31, 32, 34, 35, 36, 37, 38, and 40 are "wetlands"
constituting "waters of the United States" within the meaning of 40
C.F.R. § 232.2, and come within the protection of the Clean Water Act.
The isolated vernal pool referred to as depression 2 was or would have
been inhabited by *branchinecta lynchi*, a threatened species under the
Endangered Species Act, and the destruction of this pond affected
interstate commerce within the meaning of 40 C.F.R. § 232.2;
therefore, this feature also was a jurisdictional water.  Tsakopoulos
violated the Clean Water Act when, without a permit from the Corps, he
allowed deep rippers to plow and cause fill to be deposited into these
features in 1995 through 1997.  He further violated the Act by
allowing discing of the vernal pool.

Depressions 1, 3, 4, 5, and 6 are isolated vernal pools
which have no demonstrated connection with interstate commerce.  Given
the relatively small size of these pools, and the lack of evidence
indicating that any migratory bird or any endangered species have
utilized or would utilize them as habitat, these vernal pools are not
waters of the United States protected under the Clean Water Act.
Therefore, Tsakopoulos did not violate the Act when he caused the deep
ripper to pass through or deposit fill into these features.

2.

Estoppel Defense

Tsakopoulos argues that the EPA should be estopped from
seeking recovery for any of the violations alleged to have occurred in
linear features because he was told that he could drive the deep
rippers over the swales and intermittent drainages with the shank
raised to its uppermost position and because the government assertedly
"was aware" that this would cause the blade of the shank to be dragged

1   through the ground at a depth of six inches or more.  Tsakopoulos's
2   Trial Brief at 42-43.  The elements of estoppel are "(1) the party to
3   be estopped knows the facts, (2) he or she intends [or it is
4   reasonably believed that he or she intends] that his or her conduct
5   will be acted on . . ., (3) the party invoking estoppel must be
6   ignorant of the facts, and (4) he or she must detrimentally rely on
7   the former's conduct."  Lehman v. United States, 154 F.3d 1010, 1016
8   (9th Cir. 1998) (quoting United States v. Hemmen, 51 F.3d 883, 892
9   (9th Cir. 1995)).  This defense fails for several reasons.  First,
10  when a deep ripper of the type used on the parcels at issue in this
11  case is operated with its shank raised to the uppermost position, the
12  blade of the shank will not drag through the ground but might
13  occasionally tag the ground when the machine is jostled by bumps on
14  the ground.  Second, those agents of the government who instructed
15  Tsakopoulos that the deep rippers could be driven over the swales and
16  intermittent drainages did not believe that the blade of the shank
17  would drag continuously through the ground.  Rather, they believed,
18  based upon the statements of Andy Johas, that the blade could be
19  lifted completely out of the ground but could tag raised ground areas
20  in its path.  Finally, even if Johas were to have been mistaken when
21  he told the government's agents that the shank could be lifted
22  entirely out of the ground, it is clear that those agents relied upon
23  that advice when they told Tsakopoulos that the deep rippers could be
24  driven over the swales and intermittent drainages.  Therefore, the
25  defense of estoppel fails because "the party to be estopped" would not
26  have "know[n] the facts."  Id. at 1016.
27  ////
28  ////

30

D.

*The Civil Penalty*

Where there has been a violation of the Clean Water Act, the imposition of a civil penalty is "mandatory." Leslie Salt Co. v. United States, 55 F.3d 1388, 1397 (9th Cir.), cert. denied, 516 U.S. 955 (1995).  However, "[d]istrict courts retain the broad discretion to set a penalty commensurate with the defendant's culpability." Id. Under a framework utilized by several courts, known as the "top-down method," the district court first ascertains the maximum civil penalty, and then "determine[s] if the penalty should be reduced from the maximum by reference to the statutory factors." Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 573 (5th Cir. 1996) (citing Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (11th Cir. 1990)); see also United States v. Mun. Auth. of Union Township, 150 F.3d 259, 265 (3d Cir. 1998); Hawaii's Thousand Friends v. City and County of Honolulu, 821 F. Supp. 1368, 1395 (D. Haw. 1993).[15]  In enacting section 1319(d), "Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil

---

[15]     Another framework, known as the "bottom-up method," has been used by some courts and entails "begin[ning] with the violator's economic benefit from non-compliance . . . and then adjust[ing] up or down based on the court's evaluation of the six factors set out in [section 1319(d)]." United States v. Smithfield Foods, Inc., ___ F.3d ___, ___, 1999 WL 713847, at *11 (4th Cir. Sept. 14, 1999).  However, the Clean Water Act "does not require the use of either method." Id. at *11 n.7; see also Mun. Auth. of Union Township, 150 F.3d at 265 ("it appears that a court is free to use its discretion in choosing the appropriate method").  In light of the fact that, as discussed in section II.D.2.b., infra, determining what economic benefit Tsakopoulos derived from violating the Clean Water Act involves a relatively high amount of uncertainty, using the bottom-up method as the baseline for a civil penalty would not be desirable.  Therefore, the top-down method will be utilized in this case.

1  penalties." <u>Tull v. United States</u>, 481 U.S. 412, 422 (1987) (citing

2  123 CONG. REC. 39,191 (1977)).

3          The EPA seeks the imposition of a civil penalty of $875,000,

4  which represents the product of multiplying 35 affected features by

5  $25,000.  Tsakopoulos argues that, if a civil penalty is to be

6  imposed, it should not exceed $97.26 based upon the penalty imposed as

7  part of a Consent Decree entered April 28, 1997, in <u>United States v.</u>

8  <u>Simpson Timber Co.</u>, Case No. CIV. S-96-1890 LKK GGH, a case formerly

9  pending in this United States District Court.  Tsakopoulos's Trial

10 Brief at 55 (as corrected Aug. 11, 1999); <u>id.</u> at 36 n.16 (obtaining

11 the $97.26 figure by dividing the $30,000 penalty agreed to in <u>Simpson</u>

12 <u>Timber</u> by the 987 acres of lands affected in that case, and by

13 multiplying this per-acre amount by the 3.2 acres allegedly affected

14 in this case).

15                                    1.

16                         The Maximum Civil Penalty

17         Under section 1319(d), the maximum penalty depends upon two

18 numbers: the number of "day[s]" the Act is violated and the number of

19 "violation[s]" that have occurred.  The EPA argues that the number of

20 violations in this case equals the number of times that a deep ripper

21 passed through a water of the United States plus the number of times

22 that a vernal pool was disced.  EPA's Trial Brief at 27 & n.6.  The

23 EPA estimates that 29 swales and intermittent drainages were passed

24 through with a deep ripper a total of 1,100 times.  <u>Id.</u> at 27-28

25 n.7.[17]  No estimate is offered for how many violations occurred in the

26 ──────────────

27        [17]    This stems from the hypothesis that all of these features
   were crossed in one direction 25 times and that 15 of them were
28 crossed in another direction an additional 25 times.  <u>Id.</u>  Therefore,
                                                              (continued...)

1  vernal pools.  The EPA also contends that every day since these
2  violations occurred constitutes another day to be used in calculating
3  the maximum penalty because fill has been allowed to remain in a
4  jurisdictional water.  Id. at 28 (citing United States v. Key West
5  Towers, Inc., 720 F. Supp. 963 (S.D. Fla. 1989), and United States v.
6  Ciampitti ("Ciampitti II"), 669 F. Supp. 684 (D.N.J. 1987)).  The EPA
7  failed to estimate the maximum civil penalty, suggesting only that the
8  maximum penalty for all violations "is in the hundreds of millions of
9  dollars."  Id. at 36.  Nor has Tsakopoulos attempted to identify
10 either the number of violations, the relevant number of days, or the
11 maximum civil penalty applicable in this case.

12      A "violation" within the meaning of section 1319(d) occurred
13 whenever an unpermitted discharge took place.  The Act defines a
14 "discharge" as an "addition" of a pollutant to a jurisdictional water.
15 33 U.S.C. § 1362(12).  The EPA's argument that merely failing to
16 remove fill from a jurisdictional water constitutes a separate
17 violation of the Clean Water Act is unpersuasive.  Rather, the day on
18 which a discharge occurred is the only day that will be counted in
19 determining the maximum penalty.  Further, the features which have
20 been deep ripped involve more than one violation of the Clean Water
21 Act because of the repeated passes by the deep rippers over these
22 features.  The parties apparently agree that each pass constitutes a
23 separate violation.  Tsakopoulos concedes that a few passes through
24 certain features might have accidentally occurred.  The evidence
25 reveals that some of the linear features, including drainages 30 and
26

27  [15](...continued)
28 the EPA estimates that, on average, each linear feature was deep
ripped approximately 38 times.

31, were only deep ripped a few times in localized areas.   Other
features were simply too small to conclude that they had been passed
through with a deep ripper more than 5 to 10 times.  Considering its
size, the vernal pool was most likely deep ripped and/or disced
approximately 10 times.  On average, each of the 29 linear
jurisdictional features was passed through with a fully-engaged deep
ripper approximately 12 times.  Each of these passes-through caused
fill to be deposited into waters of the United States.  Therefore,
Tsakopoulos committed 358 violations of the Clean Water Act.[14]
Finally, eyewitness evidence reveals that, in April of 1997, deep
ripping of unspecified jurisdictional features occurred on parcel 8.
However, there is insufficient evidence to establish that the
witnessed activity, or any other deep ripping activity, affected any
of the features listed in part II.C.1., *supra*, at any time after
January 30, 1997, -- the date after which the penalty for violating
the Clean Water Act increased to $27,500.  40 C.F.R. § 19.2.[15]  Thus
the maximum penalty applicable to each of the 358 violations is
$25,000.  Therefore, the maximum civil penalty applicable in this case
is $8,950,000.

////

////

////

_____

[14]     The total violations number is calculated by multiplying the
average number of passes by a deep ripper (12) by the number of linear
jurisdictional features (29), which equals 348; and then adding to
this number the 10 violations in the vernal pool, which yields 358.

[15]     In its trial brief, the EPA notes the increased maximum
civil penalty applicable to violations after January 30, 1997, but
does not argue that any of Tsakopoulos's violations are subject to
this heightened penalty.

34

2.

Statutory Factors

a.

*The Seriousness of the Violations*

The first statutory factor concerns the seriousness of the violations, their number and continuous nature. <u>Sierra Club, Lone Star Chapter</u>, 73 F.3d at 574; <u>Pub. Interest Research Group of N.J. v. Powell Duffryn Terminals, Inc.</u>, 913 F.2d 64, 79 (3d Cir. 1990); <u>Hawaii's Thousand Friends</u>, 821 F. Supp. at 1395; <u>Natural Resources Defense Council, Inc. v. Texaco Ref. & Mktg., Inc.</u>, 800 F. Supp. 1, 23 (D. Del. 1992).  The EPA argues that this factor weighs in favor of a significant penalty in light of the number of discharges, the duration those discharges have remained in the jurisdictional waters, and the impact deep ripping has had on the hydrological functioning of the affected linear features and on the ability of vernal pools to support endangered species.  Tsakopoulos counters that, compared with the impact of the violations which were alleged in <u>Simpson Timber</u>, his violations in this case are less serious.  Further, Tsakopoulos argues that the wetlands on Borden Ranch remain functional and flowing.

Tsakopoulos has not shown that the settlement reached in the <u>Simpson Timber</u> case has any relevance to the determination of an appropriate civil penalty in this case.  <u>Simpson Timber</u> was resolved by a consent decree rather than through litigation and adverse judgment. Besides, Tsakopoulos focuses only on the monetary amount of the civil penalty in <u>Simpson Timber</u> and disregards the restoration measures required by the consent decree.  Some of these measures created ecological preserve properties to assist in the preservation of valuable natural resources, including vernal pools.  These

35

1  restoration measures could have been imposed in lieu of a more
2  significant civil penalty consistent with the objectives of the Clean
3  Water Act.

4          However, Tsakopoulos correctly points out that his asserted
5  violations of the Clean Water Act affected a relatively small area of
6  jurisdictional waters.  As Dr. Lee's findings show, the aggregate area
7  filled by deep ripping is 2.34 acres of wetlands.  This number
8  includes approximately 0.02 acres of isolated vernal pools over which
9  the government argued jurisdiction existed.  However, the EPA's
10  jurisdiction over these pools extends only to the one known as
11  depression 2, which, according to Dr. Lee's testimony, covered
12  approximately 150 square feet.  Although the evidence adduced at trial
13  pertaining to the amount of jurisdictional wetlands affected was not
14  clear enough to ascertain the exact acreage of land adversely affected
15  by Tsakopoulos's wrongful filling activities, it demonstrated that
16  approximately 2 acres of jurisdictional wetlands were caused to be
17  filled by deep ripping.

18          The hydrology of each of the 30 features affected has been
19  altered significantly.  Several of them -- drainages 9, 10, 34, 35,
20  36, 37, 38, and 40 and depression 2 -- are completely obliterated.
21  Many of the remaining features have been "clipped" and/or partially
22  filled.  While the precise environmental impact these violations have
23  had or will have on the effected wetlands is not pellucid as to some
24  of the features, the damage attributable to these violations,
25  including the diminished effectiveness of these features in filtering
26  pollutants in the water system and the decrease in exotic plant and
27  animal life, will accumulate well into the future.  Dr. Lee credibly
28  testified about these anticipated effects.  Tsakopoulos's contrary

36

contention that these features have not been significantly affected by the plowing and deep ripping activity is unpersuasive.  However, considering the nature of Tsakopoulos's violations, imposition of the maximum penalty allowed under law is not required.  But the nature of his deep ripping and plowing activity degraded or destroyed wetlands considered valuable by Congress and warrants a substantial civil penalty.[16]

---

[16]    Congress has made the following findings concerning wetlands:

(1) wetlands play an integral role in maintaining the quality of life through material contributions to our national economy, food supply, water supply and quality, flood control, and fish, wildlife, and plant resources, and thus to the health, safety, recreation, and economic well-being of all our citizens of the Nation;

(2) wetlands provide habitat essential for the breeding, spawning, nesting, migration, wintering and ultimate survival of a major portion of the migratory and resident fish and wildlife of the Nation; including migratory birds, endangered species, commercially and recreationally important finfish, shellfish and other aquatic organisms, and contain many unique species and communities of wild plants;

. . . .

(4) wetlands, and the fish, wildlife, and plants dependent on wetlands, provide significant recreational and commercial benefits, including--  .  .  .  (C) fishing, hunting, birdwatching, nature observation and other wetland- related recreational activities . . .;

(5) wetlands enhance the water quality and water supply of the Nation by serving as groundwater recharge areas, nutrient traps, and chemical sinks;

(6) wetlands provide a natural means of flood and erosion control by retaining water during periods of high runoff, thereby protecting against loss of life and property;

(7) wetlands constitute only a small percentage of the land area of the United States, are estimated to have been reduced by half in the contiguous States since the founding of our Nation, and continue to disappear by hundreds of thousands of acres each year . . . .

16 U.S.C. § 3901(a).

b.

*The Economic Benefit Resulting from the Violations*

The next factor concerns whether Tsakopoulos derived an economic benefit from the deep ripping activity on federal wetlands. The economic benefit flowing to a violator must be considered "to prevent [the] violator from profiting from [his] wrongdoing." Mun. Auth. of Union Township, 150 F.3d at 263.  The goal is "to remove or neutralize the economic incentive to violate environmental regulations." Id. at 264; see also Smithfield Foods, ___ F.3d at ___, 1999 WL 713847, at *12; Pub. Interest Research Group of N.J., 913 F.2d at 80.  "[T]he precise economic benefit a polluter has gained by violating [the Act] may be difficult to prove, so '[r]easonable approximations of economic benefit will suffice.'"  Smithfield Foods, 1999 WL 713847, at *12 (quoting and altering S. REP. No. 50, 99th Cong., 1st Sess. 25 (1985)); see also Sierra Club, Lone Star Chapter, 73 F.3d at 576; Pub. Interest Research Group of N.J., 913 F.2d at 80. The EPA suggests that "Tsakopoulos benefitted economically in several ways as a result of proceeding with deep ripping without obtaining a permit."  EPA's Trial Brief at 32.  The EPA argues he avoided the cost of pursing authorization to deep rip the jurisdictional features and mitigation costs that would have been required by the government for him to receive a permit.  Id. at 33.  Second, he saved interest costs that would have accrued had he gone through with the permitting process and, resultantly, not been able to sell parcels 6, 8, 9, and 10 as quickly as he did.  Third, he received profit from those sales sooner than he would have if a permit application had been properly submitted and processed.  Id.  The EPA's economics expert testified that the total economic benefit, obtained by adding these (and certain

38

other) elements together, equals $1,039,628.[17]  Also, the EPA points
to the tremendous profit that Tsakopoulos has earned as a result of
his conversion activities on Borden Ranch.  Tsakopoulos purchased
parcels 6, 8, 9, and 10 for $605,323 and has since sold this land for
$3,123,914.  However, he incurred approximately $673,000 in land
preparation, selling, interest, and other costs in the interim.[18]

Tsakopoulos argues that he has not benefitted economically
at all from the violations.  The properties at issue were converted
for use as vineyards and then sold at a price per gross acre, rather
than per farmable acre, so that there was no economic incentive to
fill the wetlands, and no benefit from doing so.  Tsakopoulos's Trial
Brief at 54.  Tsakopoulos also points out that he did expend *some*
additional time and money in attempting to comply with the Clean Water
Act.  Id.

The acreage involved in these violations constitutes a
minuscule fraction of the total land converted to vineyards in parcels
6, 8, 9, and 10.  Therefore, deeming his profits from the sale of
these parcels to be the economic benefit derived solely from his
violations would not reflect the extent of his economic gain.  But
Tsakopoulos did save money by selling the relevant parcels earlier

[17]     According to the EPA's expert, from avoiding the cost of
mitigation, Tsakopoulos benefitted by holding this money himself for
an economic benefit of $416,687.  From early sales, he benefitted
$601,359; and from failing to properly flag jurisdictional wetlands on
parcel 10 prior to deep ripping, he saved $21,582.

[18]     Also, according to the EPA's expert, Tsakopoulos has sold
half of the land on Borden Ranch for approximately $17 million, and
the remaining portion is worth approximately $7.7 million.  Thus,
Tsakopoulos stands to make a gross profit of roughly $16.4 million
from the Borden Ranch deal, without taking into account conversion,
interest, and other costs.

than he would have realized had he taken the time to comply with the
Act.  It is clear that he moved with celerity in his deep ripping
activities because of the prospect of making an enormous profit, the
immediate availability of this profit, and the ability to avoid
expense and delay he perceived attended to action that would ensure
compliance with the Clean Water Act.  Thus he risked damaging rare
federal wetlands because of his motivation to reap economic gain.
This factor favors a substantial penalty, but the extent of the
economic benefit is uncertain.  Where the precise economic benefit is
difficult to determine, "reasonable approximations of economic benefit
will suffice."  <u>Pub. Interest Research Group of N.J.</u>, 913 F.2d at 80.

c.

*Any History of Such Violations*

The parties dispute what should be considered when
evaluating the history Tsakopoulos has had with the Act and what
weight should be given to that history.  Tsakopoulos's past alleged
violations of the Act include those committed prior to 1993 at sites
other than Borden Ranch, those committed on the Castlehill parcel in
the fall of 1993, those committed on the Prudential parcel in the fall
of 1994, and others committed on the Sacramento County side of Borden
Ranch in 1995.  Tsakopoulos points out that the AOC entered into on
May 3, 1996, fully considered these violations and reached a
settlement that sufficiently penalized Tsakopoulos even though he was
not required to admit wrongdoing.  Tsakopoulos indicates that the AOC
fully required him to make amends for what occurred on the Sacramento
County side of Borden Ranch, and reflects a penalty equal to what the
government was likely to have obtained had the matter been fully
prosecuted instead of settled.  When the EPA considered an appropriate

40

penalty and mitigation in the AOC, and extracted from Tsakopoulos 1,368 acres of land for preserves and nearly $45,000, the EPA must have considered and intended to resolve the Sacramento County and all prior violations of the Clean Water Act (and violations of the Endangered Species Act) that Tsakopoulos had committed.  While his history is problematic, the federal government dealt with it and appears to have fully considered it in the AOC.  The EPA disagrees, contending that since Tsakopoulos committed further violations of the Act he "vitiated" the AOC by breaching the promise he made in the AOC that he would not engage in further violations.  See Exh. 66 at 11. Therefore, the EPA argues that the parties' settlement reflected in the AOC should be disregarded and the Court should begin anew when considering a penalty for Tsakopoulos's current violations in light of similar violations he allegedly committed in the past.

In determining the history of all of the violations, the Court is required to consider the duration and nature of them all, "including whether the violations are perpetual or sporadic." United States v. Smithfield Foods, 972 F. Supp. 338, 349 (E.D. Va. 1997) (citing cases), rev'd in part on other grounds, ___ F.3d ___, 1999 WL 713847 (4th Cir. Sept. 14, 1999).  A review of the AOC, in light of the trial testimony concerning Tsakopoulos's history, reflects Tsakopoulos had problems complying with the requirements of the Clean Water Act, but leads to the conclusion that the penalty under consideration now should supplement rather than supplant the governmental enforcement action reflected in the AOC.  The AOC represents a final agency enforcement action that evinces the government utilized considerable expertise as it diligently concluded an administrative agreement with Tsakopoulos which fosters the goals

41

1| of the Act.  No reason has been presented justifying undoing the
2| agreement reached in the AOC.  However, Tsakopoulos's violation of the
3| AOC itself by reneging on his assurance to comply with the Act is of
4| historical significance and weighs in favor of a more severe penalty.
5| Although all of Tsakopoulos's past history is considered, it is not
6| evaluated in the light desired by the EPA.

7|                                    d.

8|        *Any Good-Faith Efforts to Comply with Applicable Requirements*

9|        The next factor concerns whether Tsakopoulos made good faith
10| efforts to comply with the Clean Water Act.  This factor generally
11| focuses on whether the violator took any actions to decrease the
12| number of violations and whether he made an effort to mitigate the
13| impact of his violations.  <u>Smithfield Foods</u>, 972 F. Supp. at 350
14| (citing cases).

15|        The EPA contends that Tsakopoulos undertook virtually no
16| efforts to comply with the Clean Water Act and regulations promulgated
17| thereunder, disregarded the government's warnings and "chose to go
18| forward in San Joaquin County without a permit and in a manner that
19| essentially assured that the rippers would impact jurisdictional
20| waters."  EPA's Trial Brief at 34, 35.  The evidence indicates that
21| Tsakopoulos's agents utilized the deep ripping equipment almost 24
22| hours per day with little or no supervision at night, and in a manner
23| which seemed impervious to the substantial risk of ripping and
24| depositing fill into federal wetlands.  These facts strongly indicate
25| a lack of good faith.

26|        Tsakopoulos points out that he told the government about his
27| plans for Borden Ranch as soon as he realized he would purchase the
28| property and there was evidence that he made some efforts to mark

jurisdictional features.  However, the EPA correctly asserts that
Tsakopoulos repeatedly failed to adhere to the regulatory scheme and
occasionally acted as though he did not recognize the authority of the
Corps and the EPA in his dealings with them.  And although Tsakopoulos
quibbled with the Corps's enforcement authority, he knew that the
Corps had clearly directed him not to deep-rip federal wetlands.
However, the evidence does reveal that Tsakopoulos apparently intended
to avoid the necessity of obtaining a permit on parcels 6, 8, 9, and
10 by avoiding deep ripping jurisdictional waters therein.  He sought
and received the government's guidance regarding what activities he
could undertake without a permit.  While certain federal officials
apparently anticipated that he would submit permit applications for
these parcels before he deep ripped them it is unclear why he would
need a permit if he intended to avoid jurisdictional waters.

Yet the evidence reveals that Tsakopoulos expended little
effort to comply with the Act prior to the summer of 1996.  It is
undisputed there was deep ripping taking place on parcels 6 and 10
prior to the preparation and verification of a jurisdictional wetlands
delineation map, which did not take place until the spring and summer
of that year.  Final Pretrial Order filed May 27, 1999, ("the Final
Pretrial Order") at 4-5.  Without such a map, it is unclear how
Tsakopoulos's agents could successfully avoid all jurisdictional
features.  The evidence further shows that in September of 1996 some
flagging and staking was done on the San Joaquin County side,
particularly around vernal pools.  Nevertheless, deep ripping of
jurisdictional features still occurred.  Tsakopoulos testified that he
relied upon his agents to ensure compliance with the government's
guidance regarding driving over the swales and intermittent drainages.

43

But these agents had an unvigilant attitude towards compliance with
the Clean Water Act on Borden Ranch.  Finally, between September of
1994 and September of 1996, Tsakopoulos deliberately obfuscated his
understanding of the Corps's guidance respecting driving over vernal
pools and undermined the Corps's enforcement authority by wrongly
stating the agency gave him confusing guidance as to the nature of the
contact he could have with jurisdictional waters.  He knew he was not
authorized to deep rip any jurisdictional features.[19]  These findings
weigh against good faith.  While confusion did exist as to whether
Tsakopoulos needed a permit prior to deep ripping outside
jurisdictional features, Tsakopoulos understood his responsibility to
avoid federal jurisdictional features as early as September of 1994.
Yet some of his agents failed to avoid those features.  For instance,
the evidence demonstrates that there was no serious effort to avoid
waters of the United States when deep rippers plowed nearly all of
parcel 10.  This is indicative of the absence of a good faith attempt
to comply with the Act.  This factor favors the imposition of a
significant civil penalty.

e.

*The Economic Impact of the Penalty on the Violator*

Another factor concerns the economic impact a civil penalty
would have on Tsakopoulos.  However, he has entered into a stipulation
with the EPA, filed under seal March 12, 1999, wherein he agrees in
substance that the economic impact of a penalty on him need not be

---

[19]  The government's internal discussions about the extent of
its authority under the Clean Water Act, and the portion of that
debate that surfaced at one of Tsakopoulos's meetings with federal
officials, are irrelevant since Tsakopoulos knew that the Corps's
direction to him about his activities on jurisdictional waters was
clear and consistent.

1  considered in determining whether the civil penalty imposed should
2  depart from the maximum allowed under the Clean Water Act.  Further,
3  in the Final Pretrial Order, Tsakopoulos agreed that he "has the
4  financial resources to respond to any judgment which the Court may
5  make."  Id. at 21.  Therefore, this factor does not affect the
6  severity of the penalty.

f.

*Other Matters Required by Justice*

9  Further, section 1319(d) requires consideration of "such
10 other matters as justice may require" in fashioning a civil penalty.
11 The EPA argues that this Court ought to consider the need to deter
12 "the regulated community" from violating the Clean Water Act through
13 the imposition of a severe civil penalty.  EPA's Trial Brief at 36.
14 Otherwise, the EPA argues, the government's regulatory program could
15 be subverted.  Tsakopoulos does not dispute these contentions.  This
16 factor is relevant and does weigh in favor of the imposition of a more
17 severe civil penalty.  See United States v. Mun. Auth. of Union
18 Township, 929 F. Supp. 800, 809 (M.D. Pa. 1996), aff'd, 150 F.3d 259
19 (3d Cir. 1998).

20 No other matter is asserted to be, or appears to be,
21 pertinent to this determination.  Consequently, the amount of the
22 civil penalty is determined.

3.

The Amount of the Civil Penalty

25 Although the maximum civil penalty under the statute is
26 $8,950,000, the EPA seeks a lesser penalty, and injunctive relief that
27 would require Tsakopoulos to make appropriate restoration for
28 depriving the United States government and its people of wetlands.

45

The EPA's approach bespeaks that public policy interests will be served best by restoration on Borden Ranch and/or other properties owned by Tsakopoulos.  This would foster the congressional goal of protecting federal wetlands. "Congress has determined that 'the . . . destruction of the Nation's wetlands is causing [such] serious, permanent ecological damage,' . . . that wetlands merit protection by laws . . .." <u>United States v. Larkins</u>, 657 F. Supp. 76, 86 (W.D. Ky. 1987) (quoting STAFF OF SENATE COMM. ON THE ENVIRONMENT, 95TH CONG., 2D SESS., A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977, 869-70 (Comm. Print 1978)).  The issue is what monetary legal penalty should be imposed and whether Tsakopoulos could avoid any portion of that penalty by restoring damaged or destroyed wetlands.  On balance, the statutory factors dictate that Tsakopoulos either must pay a stiff civil penalty or make appropriate restoration for depriving the nation of wetlands that support wildlife and endangered species.  This is consistent with the EPA's policy of accepting "consent decree provisions which allow the reduction of a civil penalty assessment in recognition of the defendant's undertaking an environmentally beneficial 'mitigation project.'" <u>Sierra Club, Inc. v. Elec. Controls Design, Inc.</u>, 909 F.2d 1350, 1354 n.6 (9th Cir. 1990) (quoting the EPA's "Clean Water Act Penalty Policy for Civil Settlement Negotiations" (1986)).

The relative seriousness of Tsakopoulos's violations and his lack of earnest effort to comply with the Act merit a significant penalty in order to achieve appropriate retribution.  Tsakopoulos realized his obligation to ensure his agents avoided deep ripping federal wetlands but failed to devise a ripping operation sufficient to avoid these jurisdictional features.  The plan developed created a plain and obvious risk that others would rip these features because it

46

authorized ripping to occur almost continuously without enough
supervision, and even in the wee hours of the morning and night.  The
haste involved in this ripping activity was driven by a profit motive
-- to make parcels of Borden Ranch conducive for vineyards so that
sales of the properties could be consummated.  The economic benefit
Tsakopoulos obtained from his haste enabled him to realize a quicker
sale of deep ripped property, which included deep ripped
jurisdictional wetlands.  Reaping such benefits at the expense of
damaging rare federal wetlands is intolerable under the Act and
preponderates toward a significant penalty to achieve the goal of
deterrence.

On balance, all the considered factors warrant imposition of
a civil penalty pursuant to 33 U.S.C. § 1319(d).  Tsakopoulos is fined
$1,500,000 for his 358 violations of the Clean Water Act.  However,
Tsakopoulos may suspend payment of $1,000,000 of this penalty and
reduce it to $500,000 if he completes the restoration measures
identified in the injunctive relief portion of this Order.  If
Tsakopoulos elects to undertake such restoration measures, he must
file a written notice so stating within 30 days of the date on which
this Order is filed.

E.

*Injunctive Relief*

The restoration measures favored by the EPA are given
considerable deference because of its expertise in achieving the goals
of the Clean Water Act.  However, to institute those measures
Tsakopoulos would have to cooperate with the involved federal
agencies.  Although it appears that the cost of the restoration sought
is significantly less than the $1,000,000 civil penalty which will be

47

1   held in abeyance should Tsakopoulos elect to do the restoration,[20]
2   reducing the penalty in favor of restoration would be justified under
3   the reasoning that Tsakopoulos's election to do the restoration bears
4   upon the necessity of a civil penalty. Ciampitti II, 669 F. Supp. at
5   686-87. Should Tsakopoulos voluntarily elect to cooperate with these
6   agencies, that would indicate his good intention to improve the damage
7   that he allowed his agents to cause to jurisdictional features of the
8   United States. As observed by the Court in United States v.
9   Ciampitti, 615 F. Supp. 116, 125 (D.N.J. 1984), Tsakopoulos's "good
10  faith in preparing and implementing a restoration plan is a relevant
11  factor in assessing the size or necessity of civil penalties."

12          Accordingly, if Tsakopoulos makes the election to have
13  $1,000,000 of the imposed civil penalty held in abeyance pending
14  determination of whether he has made such restoration, he shall
15  cooperate with the EPA and the Corps in arranging for the preparation
16  of a restoration plan covering at least four acres in and near Goose
17  Creek, Dry Creek, and/or on other appropriate areas on property owned
18  by Tsakopoulos ("the applicable land").[21] Four acres is approximately
19  twice the acreage directly affected by his unlawful deep ripping
20  activities. In light of the indirect impact that violations like
21  those committed by Tsakopoulos have on jurisdictional waters
22  downstream, the EPA's policy is to require restoration at a two-to-one
23  ratio. See EPA's Trial Brief at 39. Tsakopoulos does not dispute
24  that, if he had applied for a permit to deep rip the 30 jurisdictional

25

26      [20]   If Tsakopoulos does not elect to do the restoration this
27  civil penalty could be used by the EPA to do restoration itself
    elsewhere.
28
        [21]   The EPA must agree to the site selected for restoration.

48

1  features, he would have been required to undertake restoration of an
2  area determined by using this ratio.  Therefore, mitigation on four
3  acres of wetlands is appropriate.  The restoration plan will be
4  prepared by an independent environmental consulting firm selected by
5  the EPA and will be subject to EPA approval.  Tsakopoulos shall
6  cooperate in the development of this restoration plan by (i) providing
7  access to the applicable land, and (ii) reimbursing the environmental
8  consultant selected by the EPA for the cost of developing the
9  mitigation plan, and (iii) assisting the United States in implementing
10  this plan.   To serve the goals of restoration, this activity may
11  include fill removal, creation of buffers, installation of culverts to
12  channel water flow, and revegetation.

13                                   III.

14                               CONCLUSION

15          For the above-stated reasons, the Court finds that Angelo K.
16  Tsakopoulos committed three hundred fifty-eight (358) violations of
17  the Clean Water Act when he caused fill to be discharged into waters
18  of the United States on parcels 6, 8, 9, and 10 of Borden Ranch.  A
19  civil penalty pursuant to 33 U.S.C. § 1319(d) is imposed in the amount
20  of one million five hundred thousand dollars ($1,500,000).  If
21  Tsakopoulos files a notice that he elects to have held in abeyance his
22  obligation to pay one million dollars ($1,000,000) of the civil
23  penalty within thirty (30) days of the date this Order is filed, then
24  the EPA shall file a proposed injunction which encompasses the relief
25  described in its Trial Brief and section II.E., *supra*, within sixty

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
27          The restoration work should be performed by an independent
    firm selected by the EPA.  Tsakopoulos shall cooperate in providing
28  access to the applicable land and shall pay the costs for implementing
    the mitigation plan.

1  (60) days of the date this Order is filed; a Judgment would then be
2  entered imposing a five hundred thousand dollar ($500,000) civil
3  penalty and an injunction requiring restoration.  If the restoration
4  is not thereafter completed as Ordered, the EPA may file a motion
5  seeking appropriate relief, which may include the re-imposition of all
6  or part of that portion of the civil penalty which was held in
7  abeyance.  However, if Tsakopoulos does not timely elect to undertake
8  the restoration, a Judgment will be entered imposing the full one
9  million five hundred thousand dollar ($1,500,000) civil penalty.

10

11          IT IS SO ORDERED.

12

13  DATED:   November  8 , 1999

14

15                                      GARLAND E. BURRELL, JR.
                                        UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
for the
Eastern District of California
November 8, 1999


* * CERTIFICATE OF SERVICE * *


2:97-cv-00858


Borden Ranch

    v.

USACE

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  November 8, 1999, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

        Edmund L Regalia                    SF/GEB
        Miller Starr and Regalia
        1331 North California Boulevard
        Fifth Floor
        Walnut Creek, CA  94596

        Edmund F Brennan
        United States Attorney
        501 I Street
        Suite 10-100
        Sacramento, CA  95814

        Catherine M Flanagan
        United States Department of Justice
        Land and Natural Resources Division
        PO Box 23986
        Washington, DC  20026-3986


                        Jack L. Wagner, Clerk

                        BY: _____
                            Deputy Clerk